No. 1488—JAMES NELLIGAN *v.* THE CITIZENS' BANK OF LOUISIANA.

The military orders issued to the banks of New Orleans during the late war directing them to make a statement of such deposits as belonged to officers of the army of the Confederate States, and directing them to pay over to the proper officer of the Quartermaster's Department of the United States all moneys in their possession belonging to or showing upon their books to the credit of such persons, was an attempt on the part of the military authorities to sequester these funds.

A Bank cannot be relieved from paying a deposit to the proper owner on the ground that it has paid over the amount of the deposit in Confederate treasury notes to the Quartermaster of the United States army, under military orders, unless it is shown that the deposit was made in the bank in Confederate money with the knowledge of the depositor.

The sequestration and taking possession of Confederate treasury notes by the military authorities of the United States, which the banks of the city of New Orleans had given over as the deposits of officers engaged in the rebellion, did not amount to a sequestration by the United States of the credits of said parties, against the banks.

Confederate notes having been issued in violation of law, and against good morals and public policy, could not form the basis of a seizure or sequestration so as to exonerate the banks from liability to their depositors.

APPEAL from the Fourth District Court of New Orleans. *Théard, J. Breaux & Fenner,* for plaintiff and appellant. *Armand Pitot,* for defendants and appellees.

HOWE, J. The plaintiff sues for thirty-five hundred dollars, the amount of a deposit made by him in the bank of defendants on the fourth January, 1862. The defense set up in the answer is that the amount of the plaintiff's deposit was paid over to the quartermaster of the United States army on the twenty-third August, 1863, at New Orleans, in pursuance of military orders, as the funds of an officer in the rebel army, a receipt taken and the defendants thereby discharged from all liability.

There was judgment for defendants and plaintiff has appealed.

It appears by the evidence that at the time stated in the answer, the defendants, in what they claim to have been a compliance with military orders, delivered to Captain J. W. McClure, acting quartermaster, the sum of thirty-five hundred dollars, in Confederate notes, as the balance of deposit due to plaintiff. We are of opinion that, to enable them to successfully urge this fact as a defense to the demand of the plaintiff, they must show that the deposit made by the plaintiff was made in Confederate notes. The military orders were intended to sequester property.

The first, of date August 7, 1862, directed the banks to make a statement of such deposits as belonging to officers of the army of the Confederate States (among other classes of persons), and to hold the same till further action. The second order, of date August 17, 1863, directed the banks to pay over to the proper officers of the quartermaster's department all moneys in their possession belonging to or standing upon their books to the credit of the same classes of persons. By an official communication of August 20, 1863, the commanding general declared "the *transfer* of these *balances* from the banks to the officers

of the government is not in the light of an absolute forfeiture." Clearly, then, the military authorities attempted to sequester. If in this case that attempt was successful, the plaintiff has no claim. But if the attempt was abortive the defendants can hardly with good grace complain of the plaintiff's good fortune. Now, whether the sequestration was actually made will depend on the solution of the question of fact whether the defendants received Confederate notes on deposit, from plaintiff, or lawful money.

If the deposit was made in lawful money, we cannot perceive on what principle of law or equity the defendants could discharge themselves from liability to plaintiff by the delivery to the quartermaster of Confederate notes proved in this case.

It is however contended with much vigor by defendants that if the United States government is satisfied with this so-called payment, the plaintiff is without interest to complain; that his claim was confiscated, and even if the bank did not pay over what it had received as a deposit, it is for the government, and not for the plaintiff, to make further demand, and upon this point they refer to the case of *Mandeville v. the Bank of Louisiana*, 19 An. 392.

That case does not properly support these views. There, a real payment of the amount of plaintiff's deposit had been made to the quartermaster, in lawful money; and the court declared that this *payment* necessarily released the bank. In other words, the sequestration was actually made. But the delivery of Confederate notes in discharge of an obligation arising from a deposit of lawful money is not a payment, without the consent of the creditor; nor would such delivery be a compliance with an order to turn over the balance of such a deposit to the quartermaster. If under such circumstances the quartermaster received Confederate notes only, he failed to obtain what he was trying to obtain—the defendants failed to give up to him what they ought to have given up.

We find it necessary to inquire, then, in this case, whether the defendants have shown as part of their defense that the deposit by plaintiff was made in Confederate notes.

Upon this point the plaintiff's testimony is substantially as follows:

"I went to the bank on the fourth January, 1862, and as I got inside the door, I was stopped by Mr. Denégre, president of the bank. I was asked by him how his son was, and he invited me into his room on the left hand side of the entry. He asked me if I was going to make a deposit. I had in my possession at the time, the check marked 'A' and some money. I do not now recollect but what Mr. Denégre took my money and check, and had the entry made in the bank book marked 'B,' and returned the book to me with the entry made in it; I handed the check and money to Mr. Denégre, and he had the entry made. I will not be positive as to Mr. Denégre making the deposit for me; but

am positive the check marked 'A' and four hundred or five hundred dollars which I had in my pocket, constituted the deposit made. *We had no conversation in regard to Confederate money.* The check marked 'A' was received from Mr. Gerard Farrell for money loaned by me to him *before the war.* My object in drawing the money and depositing it in bank was *to put it in a place of safety.* I left the next day for Virginia, and considered it in a place of safety. I had nothing more to do with the matter until after the war. When Farrell gave me the check he did not say anything about Confederate money. I supposed it to be the same as I had loaned him." * * * *

*Cross Examined.—* * * * "I was only here three days in 1862, and cannot say what the currency was at the time. All the transactions I had were in gold: I can't say whether the money I gave to Mr Denégre was in gold, Citizen Bank notes, or what kind it was. I was not long enough in town to find out the currency then prevailing. When I went to Virginia I took one thousand dollars in gold, and when I came back I brought back five hundred dollars. I can't say what the value of Confederate currency was. In 1862, when I was in Norfolk, Virginia, gold and silver were current. * * Where I was, I saw more gold and silver than Confederate money. I did not look into the bank book when Mr. Denégre returned it to me." Being asked, " were you not surprised in finding the words *current funds* instead of *cash* written in the book?" says: "I never paid any attention to it; not being accustomed to banking business, I trusted the officers."

The check referred to in this testimony is an ordinary bank check, drawn by Gerard Farrell on the defendants, for $3,294 90.

John G. Gaines, for defendants, testified that the currency of the country at that time was Confederate States treasury notes; that any check drawn on the bank, unless otherwise specified, would be paid in Confederate money ; that Farrell's check was payable and would have been paid in Confederate money ; that from September, 1861, it was understood with depositors that all checks were payable in Confederate money, unless there was a special deposit, and that there was no special agreement with Mr. Farrell as to the payments of his checks. "In most of the bank books," continues this witness, " a printed notice was posted notifying all depositors that all deposits made or checks drawn would be in Confederate money The omission to post the notice in the book marked 'B' [the plaintiff's bank book], was through error or mistake. Whenever the notice was omitted it was done so through error." The bank book of Farrell was put in evidence by defendants, and from that it appears that on the sixteenth September, 1862, the depositor, Farrell, had a balance in the bank of $7481 17, in lawful money. This balance does not appear to have been reduced at the time the check to plaintiff was drawn.

It will be perceived at once that this case differs from that of Erwin's

Executors *v.* Bank of New Orleans, lately decided, and resembles in some important features the case of Weaver *v.* Anfoux, 20 An. p. 1.

The plaintiff for a loan of lawful money receives the check of Farrell, drawn upon a bank in which Farrell has a large deposit in lawful money. Farrell does not inform plaintiff that the check will be paid in Confederate notes. The check does not convey any such idea. The officers of the bank in receiving it on deposit and giving the plaintiff credit for the amount do not so inform him. We find no reason in this record to doubt his statement that he supposed it to call for the same kind of money that he loaned Farrell before the war. As for the balance of the deposit there is no evidence to show that it was other than lawful money.

From the evidence as a whole we conclude, that the defendants on whom the *onus* was under the pleadings, have not established that this deposit was made in Confederate notes, and that therefore proof of the delivery of $3500 of such notes to the quartermaster, did not establish a discharge of the liability of the defendants.

It is therefore ordered and adjudged that the judgment appealed from be avoided and reversed, and that the plaintiff have judgment against the defendants for the sum of thirty-five hundred dollars with legal interest thereon from September 1, 1865, until paid, and costs in both courts.

Rehearing refused.